# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION
# 1:17-cv-00263-FDW

| | |
|---|---|
| JOE L. SHOLTZ, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| APRIL STROUPE, et al., ) | **ORDER** |
| ) | |
| Defendants. ) | |
| ) | |

**THIS MATTER** comes before the Court on Defendant April Stroupe's Motion for Summary Judgment [Doc. 25] and Plaintiff Joe L. Sholtz's Motion for Summary Judgment and Motion to Add Colby Dodd as a Defendant [Doc. 36].

## I. BACKGROUND

### A. Procedural Background

Pro se Plaintiff Joe Sholtz is a North Carolina prisoner currently incarcerated at the Federal Medical Center in Butner, North Carolina. Plaintiff filed this action on September 20, 2017, under 42 U.S.C. § 1983, and an Amended Complaint on January 16, 2018. Plaintiff named as Defendant April Stroupe, identified as a nurse employed by Southeast Correctional Medical Group, and working at the Buncombe County Detention Center (the "Jail") at all relevant times.[1] The Plaintiff claims that Defendant Stroupe was deliberately indifferent to his serious medical needs based on Stroupe's failure to provide him with proper medical care related to treatment of his throat cancer while Plaintiff was incarcerated as a pre-trial detainee at the Jail in 2017 in violation of the Eighth

---

[1] The Plaintiff also listed an unnamed "Executive" with Southeast Correctional Medical Group (SECMG) as a Defendant. [Doc. 13 at 2]. The Plaintiff, however, made no allegations specific to this unnamed person and the Plaintiff's Amended Complaint survived initial review as to Defendant Stroupe only. [See Doc. 14 at 2].

Amendment. Plaintiff seeks monetary damages and court costs.

On November 13, 2018, Defendant Stroupe filed her pending summary judgment motion. [Doc. 25]. In support of her summary judgment motion, Defendant Stroupe has filed her own Affidavit, the Plaintiff's medical intake screening records, the SECMG's Chronic Disease Services Policy, the Plaintiff's medical records from the Jail, the Plaintiff's medical records from outside care providers, and the Jail's pharmacy service's medication storage and disposition policies.[2] [Docs. 26-2; 26-3; 26-4; 35-1 through 35-6].

On November 20, 2018, this Court entered an order in accordance with <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the summary judgment motions and of the manner in which evidence could be submitted to the Court. [Doc. 29]. The Plaintiff was specifically advised that if he had any evidence to offer to show that there is a genuine issue for trial, he must present it to the Court "in a form which would otherwise be admissible at trial, <u>i.e.</u>, in the form of affidavits or unsworn declarations." The Court further advised that:

> An affidavit is a written statement under oath; that is, a statement prepared in writing and sworn before a notary public. An unsworn statement, made and signed under the penalty of perjury, may also be submitted. Affidavits or statements must be presented by Plaintiff to this Court no later than fourteen (14) days from the date of this Order and must be filed in duplicate.

The Plaintiff filed a response to Defendant's summary judgment motion, which consists of a "Statement of Facts." Attached thereto are various select pages of Plaintiff's medical records, various kiosk records, and Defendant's discovery responses. [Docs. 30, 30-1]. The Plaintiff

---

[2] Defendant Stroupe indicated that "kiosk records" would also be filed as Exhibit 7 in support of her summary judgment motion once the Court allowed Defendant to file certain records under seal. [Doc. 26-1 at 1, 27]. The kiosk records, however, were not filed with the other exhibits the Plaintiff filed after the Court allowed Defendant's motion to seal. [<u>See</u> Doc. 35]. The Plaintiff, however, submitted kiosk records with his response to Defendant's summary judgment motion. [<u>See</u> Doc. 30-1].

submitted no affidavits and no statements signed under the penalty of perjury in response to the Defendant's summary judgment materials. [See id.]. On February 4, 2019, the Plaintiff filed his own summary judgment motion. [Doc. 36]. In this motion, the Plaintiff purports to now seek $250,000 in punitive damages and $450,000 in damages for emotional distress. [Doc. 36 at 1]. Also, in this summary judgment motion, the Plaintiff moves to amend his complaint to add Colby Dodd as a Defendant in this matter. Mr. Dodd is a physician's assistant (P.A.) who also provided care to the Plaintiff at the Jail. [Doc. 36 at 2]. The Plaintiff, however, submitted no admissible evidence in support of his summary judgment motion. [See Doc. 36].

B.     **Factual Background**

The Defendant's forecast of evidence shows the following:

The Jail contracts with Southeast Correctional Medical Group (SECMG) to provide clinical medical services for inmates. [Id. at ¶ 2]. Defendant April Stroupe is a licensed nurse practitioner and was employed by the SECMG as the Clinical Site Coordinator at the Jail at all relevant times. [Doc. 26-2 at ¶ 3].

When the Plaintiff arrived at the Jail on March 30, 2017 on transfer from his previous place of incarceration in Tennessee, he had just recently completed a ten-week course of chemotherapy and radiation treatment for stage IV tonsillar cancer only two weeks before. [Doc. 35-1 at 29, 27]. The Plaintiff was booked at the Jail at 12:21 p.m. on March 30, 2017. [Doc. 35-1 at 29]. The Plaintiff's medical intake screening was conducted only an hour later at 1:30 p.m. by Tina Miller, LPN. [Id.]. The intake record shows that, as a result of his recent cancer treatment, the Plaintiff has residual blisters and scabs in his throat; red, swollen gums; and a swollen tongue and left side of his face. [Id.]. The intake record also showed that Plaintiff had a G-tube[3] placed in December

---
[3] A G-tube, or gastrostomy tube, is a tube inserted through the belly that brings nutrition directly to the stomach.

3

2016 and that he was prescribed "magic mouthwash po one teaspoon q 6 hours prn," meaning one teaspoon of magic mouthwash by mouth every six hours as needed, in addition to several other medications. [Id.]. The records also note that Plaintiff "takes 2 cans of 1.5 cal[4] 0500 10 am 1400 and 1900" through his G-tube. [Id.]. Other records show that the Plaintiff had had left ear pain ever since being diagnosed with cancer in December 2016. [Doc. 35-1 at 13].

Stroupe was involved in the Plaintiff's throat cancer treatment while he was incarcerated at the Jail. [Id. at ¶ 5]. On the day of the Plaintiff's intake, Defendant Stroupe completed a medical request for the Plaintiff's special care needs. [Doc. 35-1 at 37]. The request lists the Plaintiff's needs as including, among other things, "Magic mouth wash 1 tsp twice daily. (As needed)." [Id. at 37]. This request by Stroupe does not reflect the dosage of magic mouthwash listed in Plaintiff's intake record. Namely, the Plaintiff's intake record notes a need for the mouthwash every six hours, as needed. [Id. at 29]. Whereas, the medical request notes that he needs the mouthwash twice daily, or every 12 hours.[5] [Id. at 37].

The Plaintiff was examined by Colby Dodd, P.A. ("P.A. Dodd"), the next day on March 21, 2017. P.A. Dodd noted that the Plaintiff had been diagnosed six to seven months ago with throat cancer while incarcerated at another facility. He further noted that the Plaintiff had been having ongoing headaches and ear pain that lead to the discovery of a large mass over the left region of his throat. The Plaintiff underwent ten weeks of radiation and chemotherapy, which had recently been completed two weeks ago. [Doc. 35-1 at 26]. P.A. Dodd ordered, among other

---

[4] In the medical records, the Plaintiff's food supplement is referred to as "1.5 Cal" and "2 Cal," it seems interchangeably. [See, e.g., Doc. 35-1 at 26, 32, 37].

[5] The source of this inconsistency is unclear. It is, of course, possible and perhaps likely that Defendant Stroupe errantly transcribed the dosage of this medication. It is also worth noting, however, that the Plaintiff's treating oncologist prescribed the same total daily amount of magic mouthwash as noted by Defendant Stroupe only a month later. [Doc. 35-1 at 68].

things, that Plaintiff use "Magic mouth wash BID [twice daily]" and requested that the medical records from Plaintiff's oncologist be obtained. [Doc. 35-1 at 27].

On April 11, 2017, the Plaintiff was seen by P.A. Dodd complaining of increased pain and a feeling of "rawness" in his mouth, tongue, and throat, despite the use of magic mouthwash. [Doc. 35-1 at 25]. P.A. Dodd noted that this pain and "rawness" was secondary to recent radiation treatment. [Id. at 25]. P.A. Dodd ordered that the Plaintiff's magic mouthwash be increased to every four or six hours, "which ever is available." [Id. at 25].

Just three days later, on April 14, 2017, the Plaintiff was seen by Charlene Parker, RN, for a sick call and complained that the mouthwash was not helping his pain, which was keeping him from sleeping. [Doc. 35-1 at 23]. At this visit, the Plaintiff advised Nurse Parker that the mouthwash he had been taking in Tennessee was clear and much more effective in soothing his throat. [Id.]. The Plaintiff reported that his throat was very sore, raw, and felt as though something might be stuck in it. [Id.]. The Plaintiff also told Nurse Parker that Belew Pharmacy in Tennessee supplied the Plaintiff's mouthwash at his previous place of incarceration. [Id.]. In response to this visit with the Plaintiff, Nurse Parker noted that she:

> Called Belew Pharmacy in Knoxville, TN, to get Magic Mouthwash formula pt. had been receiving there. Pharmacist states the ingredients were equal parts (60 ml each) of: 2% Viscous Lidocaine, Diphenhydramine 12.5 mg/ml, Dexamethasone 0.5 mg/ml, and Glycerin (to equal one 240 cc bottle). Shared this info with April Stroupe, LPN, CSC. Called Diamond pharmacy and gave this list of meds to Chris who also called and verified the compound with Belew Pharmacy in Knoxville, TN. New Magic Mouthwash with medications previously mentioned above, was created in the available med list in Sapphire for ordering, is being compounded for pt. today and is scheduled for delivery here tomorrow, 4/15/17. Pt. may keep this medication in his cell and use 1 teaspoon every 4-6 hours PRN for throat discomfort.

[Doc. 35-1 at 23]. The Plaintiff's records then note that, on April 26, 2017, the patient complained

of increased throat pain and that his throat appeared red and raw. This record reflects that the patient was scheduled to see his oncologist later in the week and that P.A. Dodd approved an increase in Plaintiff's pain medication, Oxycodone. [Id. at 21].

On April 27, 2017, the Plaintiff had a new patient appointment with oncologist, Martin Palmeri, M.D., of Cancer Care of WNC. At this visit, the Plaintiff complained of mouth pain and told Dr. Palmeri that he had been using the magic mouthwash intermittently, but that it did not seem to be helping. [Doc. 35-1 at 69]. In the note for this visit, Dr. Palmeri prescribed the Plaintiff 5 ml of magic mouthwash four times daily. This is, of course, equivalent to 10 ml twice daily. Dr. Palmeri also noted that the Plaintiff was "having increased difficulty swallowing and mouth pain, particularly in the setting of what appears to be an enlarging lesion in the base of the left tongue. I would recommend further workup and evaluation." Dr. Palmeri states, "I plan to refer him to ENT [ear, nose, and throat] for direct laryngoscopy and biopsy." Dr. Palmeri also noted that he plans to repeat a PET scan of the Plaintiff's entire body prior to the Plaintiff's follow up with Dr. Palmeri. [Id. at 66].

On May 4, 2017, the Plaintiff was examined again by P.A. Dodd. P.A. Dodd noted:

> [Plaintiff] presnts [*sic*] for f/u visit to evaluate nightingale oral mucosal pain secondary to radiation burns. <u>Notes Magic Mouth wash is helping</u>, however he is not getting it as often as he needs. He is using it every 4-6 hrs and apparently running out within a few days. He recently went for an initial consult with Avl Oncology, where not much was established apparently [as a result of] them not having his previous medical records. A f/u appointment was made for 2-3 weeks. He notes increased pain and swelling with food and liquid intake and that it is very painful to eat. We started him on Oxycodone for pain management which seems to help somewhat.

[Doc. 35-1 at 20 (emphasis added)]. P.A. Dodd diagnosed Plaintiff with an oral radiation burn and noted that he would "attempt to increase frequency of Magic mouth wash, possibly compounding our own here in the clinic for him with Lidocaine 2% viscous, Malox, and

6

Benadryl." [Doc. 35-1 at 20]. There is no evidence, however, that anyone from SECMG, including Defendant Stroupe, ever compounded the magic mouthwash for the Plaintiff at the Jail. A few days later, on May 9, 2017, a note in the Plaintiff's chart, recorded by Defendant Stroupe, states "[p]er Colby Dodd, PA-C Oxycodone [d]iscontinued due to patient holding in cell and not taking as prescribed. Offer to patient to have meds crushed and patient refused. Stated he did not want the medication anymore." [Doc. 35-1 at 19].

It appears that at some time between the Plaintiff's first visit with Dr. Palmeri on April 24, 2017 and his follow up appointment on May 18, 2017, the Plaintiff underwent a PET scan, as the PET scan results are documented in the note for the May 18 visit. [See Doc. 35-1 at 71]. Dr. Palmeri notes the results are "concerning for residual metabolically active malignancy." [Id.]. Then, on May 24, 2017, Defendant Stroupe entered in Plaintiff's medical chart that the Plaintiff's pain medication would be re-started "as long as it is crushed." [Doc. 35-1 at 18]. On or about May 25, 2017, P.A. Dodd sought and obtained approval for the Plaintiff to receive an increased does of magic mouthwash, 10 ml six times daily. [Id. at 86-7].

On June 12, 2017, the Plaintiff had a new patient visit with ENT physician Barry Pate, Jr., M.D. [Doc. 35-1 at 175]. Dr. Pate's note states that the Plaintiff "has been referred from Buncombe County Corrections re both follow up care and new symptoms regarding Stage 4a left tonsillar cancer. Treatment ended in Feb 2017 but he now complains of increased difficulty with pain and swallowing." [Id. at 175]. After examining the Plaintiff, Dr. Pate concluded that the Plaintiff "appears to be having ongoing affects from the Chemo and [radiation therapy]. Not convinced he is having any recurrence at this time." Dr. Pate recommended that the Plaintiff follow up with his physicians in Tennessee "because they would have a better understanding of what the cancer looked like prior to treatment and whether he is getting response now." [Id. at

7

176]. Dr. Pate also recommended that the Plaintiff "continue present pain management as needed" and prescribed an antibiotic for the Plaintiff. [Id.].

On the same day as the Plaintiff's appointment with Dr. Pate and after the Plaintiff presented to Defendant Stroupe for an increase in pain medication, P.A. Dodd authorized an increase in the dosage of Plaintiff's pain medication. [Doc. 35-1 at 16]. On June 19, 2017, the Plaintiff again saw Dr. Palmeri and reported on his appointment with Dr. Pate. The Plaintiff told Dr. Palmeri that his magic mouthwash had "helped to some degree with mouth pain," that it was still painful to swallow, and that he was currently taking 5 mg of Oxycodone twice a day. [Id. at 119]. Dr. Palmeri ordered an additional antibiotic for the Plaintiff, and stated, in summary, that if the Plaintiff's symptoms do not improve in two to three weeks with his current therapies, the Plaintiff should return to Dr. Pate for reevaluation. [Id. at 115]. On the same day, Dr. Palmeri gave a phone order to Defendant Stroupe for the new antibiotic and another increase in Plaintiff's pain medication, which Defendant Stroupe documented in the Plaintiff's chart. [Id. at 15]. There is no evidence in the record that this order was not followed.

Defendant Stroupe entered notes in Plaintiff's chart for both August 9 and 10, 2017, documenting calls from the office of Dr. Hanna related to medication approvals and follow up care. [Doc. 35-1 at 10]. Dr. Hanna was the Plaintiff's treating oncologist in Tennessee while Plaintiff was incarcerated there. It is unclear from the record when the Plaintiff resumed care with Dr. Hanna, but it presumably was in response to Dr. Pate's recommendation that the Plaintiff be seen by his physicians in Tennessee. [See Doc. 35-1 at 176]. Then, on August 11, 2017, Defendant Stroupe noted in the Plaintiff's chart the following:

> Received a threatening message through the kiosk from [the Plaintiff] today. Went to the unit to speak with patient and he refused to talk to me. Stated that he didn't care and that it was all "bullshit." I had the patient's a.m. dose of oxycodone with me since

8

> it was missed this a.m. due to pharmacy shipment. Patient also refused medication and stated that "he didn't need it anyway." I offered multiple times to explain to the patient about the situation and why his medication was running late. He didn't want to hear anything I had to say. Officer Austin and Officer McDowell both witnessed this communication and he is receiving a lock back due to disrespect.

[Doc. 35-1 at 11 (punctuation and grammar corrected)].

On August 22, 2017, the Plaintiff was seen by a Nurse Practitioner, Christine Wilson, in Dr. Hanna's office "for a regularly scheduled follow up appointment." [Doc. 35-1 at 129]. In the record for this visit, Ms. Wilson notes that "the patient is requesting to transfer care here given that he had his original course of chemo and radiation her [*sic*]." [Id.]. Ms. Wilson also states that, "[a]t a previous visit, a PET-CT as well as an ENT referral was placed, however, the patient was unable to get these. Therefore, we will better coordinate with the jail in Asheville to insure [*sic*] he gets his ENT referral as well as PET-CT."[6] [Id.]. The next day Dr. Hanna's office sent Defendant Stroupe a fax requesting that the Plaintiff be able to get a second opinion from a different ENT physician. [Id. at 130].

On or around September 7, 2017, the Plaintiff mailed his original Complaint in this matter. [Doc. 1]. It was filed on September 20, 2017. On or around September 12, 2017, the Plaintiff underwent another PET scan, which was "concerning for recurrent disease on the left tonsil along with possible metastatic lymph node left neck and right hilum." [Doc. 35-1 at 151]. On September 18, 2017, the Plaintiff was seen for a second opinion by ENT Robert Moore, M.D., with Asheville Head, Neck & Ear Surgeons. [Doc. 35-1 at 151]. Dr. Moore noted that the Plaintiff had finished his chemotherapy and radiation therapy in March 2017 but had "had a significant break in his

---

[6] It is not entirely clear from the record, but it appears that Nurse Wilson is referring to an order that was given by Dr. Hanna while the Plaintiff was still incarcerated in Tennessee. In any event, there is no evidence that Defendant Stroupe or anyone at SECMG was ever made aware of this order.

9

therapy due to treatment toxicity." [Id.]. The Plaintiff reported to Dr. Moore that he had had worsening left ear pain, throat pain and trismus (lockjaw) over the last six weeks. [Id.]. Dr. Moore concluded that the Plaintiff's history along with PET scan results and clinical examination findings were suggestive of "likely recurrent/persistent squamous cell carcinoma left tonsil fossa." [Id. at 147]. A cut biopsy was, therefore, performed at this visit. [Id.]. Dr. Moore noted that if the results did not confirm the suspected diagnosis, the Plaintiff would undergo a biopsy of the deep tissue under anesthesia. [Id.]. The results of the biopsy, which were available the next day, showed "features consistent with ulceration, no tumor seen." [Id. at 145].

On October 10, 2017, Tonia Bartlett, LPN, recorded in the Plaintiff's chart that he was out of Oxycodone. Nurse Bartlett called Dr. Hanna's office for approval for additional pain medication. Dr. Hanna's office returned her call on October 12, 2017, requesting that the Plaintiff be provided Oxycodone pending the outcome of the biopsy that was scheduled for October 20, 2017. [Id. at 10]. The Plaintiff was given a two-week supply of this medication. [Doc. 35-1 at 9]. Plaintiff underwent the deep tissue biopsy at Mission Hospital on October 20, 2017, as planned. The results showed only "ulcerated and inflamed squamous mucosa." The biopsy was negative for cancer. [Id. at 161].

Then, on November 1, 2017, Nurse Bartlett documented that she had received a phone call from a nurse with Hanna Oncology, that the biopsy report had been received and reviewed, and that the Plaintiff's Oxycodone was to be discontinued. Nurse Bartlett also wrote that the Plaintiff was to have a follow up CT scan in 3 months and schedule a follow up with Dr. Hanna after the scan. [Doc. 35-1 at 9]. On December 4, 2017, the Court learned that the Plaintiff had been transferred to the Western Virginia Regional Jail in Salem, Virginia. [Doc. 10]. It appears from the record that the Plaintiff had been transferred there sometime in November 2017. [See Doc.

30-1 at 50].

The Plaintiff, on the other hand, alleges as follows:

Defendant April Stroupe "made it her duty" to ignore the Plaintiff's medical condition. The Plaintiff claims that Defendant Stroupe ignored his oncologist's orders for treatment and tests. [Doc. 13 at 13]. The Plaintiff alleges that his doctors prescribed "Magic Mouthwash" to treat infection, sores, and blisters and to numb his throat, but that Defendant Stroupe prepared the mixture herself rather than have the pharmacy prepare it. [Id.]. Plaintiff alleges "[t]hat's why I had so many problems. May, June, July I had ifections [*sic*] blisters and huge sores swelling…. I had a [*sic*] earache so bad at times had to stay in my cell. I stumbled around Officer Raines once I couldn't even stand up." [Id.].

Plaintiff also alleges that he would run out of his "2 Cal" food supplement, which he took through a "tube in his stomach," every three weeks up to five days at times. He also states that he was given molded and outdated 2 Cal. [Id. at 12-13, 15]. The Plaintiff also alleges that he went to see "[his] oncology doctor in Knoxville, TN, Dr. Hanna [because] Mission Hospital didn't want to see [him]. Dr. Hanna orders tests for 3 months 3 times before April Stroupe does the tests." [Id. at 15 (some grammatical errors corrected)].

While the Plaintiff made these allegations in his Complaint, they are directly contradicted by the Plaintiff's own medical records. Further, the Plaintiff presented no evidence in response to Defendant's summary judgment motion to create a genuine issue of material fact for trial. Defendant Stroupe, however, specifically responded to the Plaintiff's allegations in her summary judgment Affidavit, in which she swears that:

> (6) Mr. Sholtz was never given any outdated medication or 2cal feedings by myself or any other Southeast medical personnel.
>
> (7) Additionally, Mr. Sholtz never went days without receiving his

11

> 2cal tube food or any other prescribed medication.
>
> (8) I never mixed any medications for a patient, and did not mix any medication or mouthwash for Mr. Sholtz. Instead, I made numerous efforts to ensure that Mr. Sholtz received his medications and mouthwash prescribed to him by various physicians.
>
> …
>
> (10) Based on my 15 years of experience as a nurse, I believe the care we provided Mr. Sholtz went above and beyond what was required as we constantly responded to Mr. Sholtz's complaints in a timely manner, would try to convince him to take medication when he refused, and allowed him to have narcotics despite his verbally abusive and threatening remarks to staff and his previous violations of distributing his medication to other inmates.
>
> (11) I also purchased Listerine for Mr. Sholtz, using my own personal funds, to help sooth his throat pain.
>
> (12) Any time Mr. Sholtz made a complaint, was prescribed medication, needed to be referred to another physician, or needed refills for medication, I, and Southeast medical team, met the demands in the ordinary course of business with diligence and care to ensure that Mr. Sholtz's throat cancer needs were accommodated.

[Doc. 26-2 at ¶¶ 6-8, 10-12].

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)

(internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S.Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III. DISCUSSION

Claims under 42 U.S.C. § 1983 based on an alleged lack of or inappropriate medical treatment fall within the Eighth Amendment's prohibition against cruel and unusual punishment.[7] Estelle v. Gamble, 429 U.S. 97, 104 (1976). To state a claim under the Eighth Amendment, a

---

[7] Because Plaintiff was a pre-trial detainee at all relevant times, his deliberate indifference claim is properly brought under the Fourteenth Amendment, rather than the Eighth Amendment, but the analysis is the same. See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239 (1983); but see Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473, 2475 (2015) (holding that the test for excessive force claims brought by pre-trial detainees under the Fourteenth Amendment differs from the test for excessive force claims brought by convicted prisoners under the Eighth Amendment). This Court observes that even if the Fourth Circuit were to apply the Kingsley v. Hendrickson "objective unreasonableness" standard that currently applies to pre-trial detainees' excessive force claims to pre-trial detainees' deliberate indifference claims, the Plaintiff has still not presented sufficient evidence to withstand Defendant's summary judgment motion.

plaintiff must show a "deliberate indifference to serious medical needs" of the inmate. Id. "Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care." Young v. City of Mt. Ranier, 238 F.3d 567, 575-76 (4th Cir. 2001) (citations omitted). "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990).

Allegations that might be sufficient to support negligence and medical malpractice claims do not, without more, rise to the level of a cognizable Section 1983 claim. Estelle, 429 U.S. at 106; Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it."). To be found liable under the Eighth Amendment, a prison official must know of and consciously or intentionally disregard "an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994); Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998). "[E]ven if a prison doctor is mistaken or negligent in his diagnosis or treatment, no constitutional issue is raised absent evidence of abuse, intentional mistreatment, or denial of medical attention." Stokes v. Hurdle, 393 F. Supp. 757, 762 (D. Md. 1975), aff'd, 535 F.2d 1250 (4th Cir. 1976). The constitutional right is to medical care. No right exists to the type or scope of care desired by the individual prisoner. Id. at 763. Therefore, a disagreement "between an inmate and a physician over the inmate's proper medical care [does] not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (dismissing the plaintiff's § 1983 claim against a defendant physician for allegedly discharging the plaintiff too early from a medical clinic, as such claim did not rise to

the level of deliberate indifference but would, "at most, constitute a claim of medical malpractice").

Here, the undisputed facts show that Defendant Stroupe was not deliberately indifferent to Plaintiff's medical needs—and, in fact, Stroupe acted diligently and attentively to the Plaintiff's special needs and in accordance with the orders of the Plaintiff's treating physicians. [See Doc. 26-2 at ¶¶ 5, 8, 10, 12]. Defendant Stroupe testifies and the medical records support that she followed all care instructions P.A. Dodd and the various other physicians who treated the Plaintiff. [Id.]. Stroupe also testified and the records reflect that she followed the instruction of pharmacists who provided medications to treat the Plaintiff for his throat cancer. [Id.]. The Defendant's forecast of evidence demonstrates that she acted diligently, was attentive to the Plaintiff's special needs, and acted in accordance with the orders of the Plaintiff's treating physicians.

The Plaintiff, however, has provided no evidence by way of affidavit or under the penalty of perjury to create a genuine issue of material fact relative to the Defendant's forecast of evidence. [See Doc. 30]. Specifically, and not by way of limitation, the Plaintiff presented no evidence, sworn or otherwise, that any alleged lapses in the provision of Plaintiff's Magic Mouthwash or 2Cal supplement was the fault of Defendant Stroupe. While there is some evidence that there may have been a brief delay in SECMG having the correct formulation of Plaintiff's magic mouthwash, there is no evidence that Defendant Stroupe – or any of Plaintiff's healthcare team at the Jail -- was responsible for that delay. Further, while there is some evidence that there may have been brief delays in the Plaintiff's stock of magic mouthwash being refilled during the course of his incarceration, there is no evidence that these delays were the result of any negligence by Defendant Stroupe, let alone any deliberate indifference to the Plaintiff's medical needs. Rather, at best, it appears that Plaintiff may have used the mouthwash more frequently than prescribed, which was

15

causing him to run out before he was due to receive more.

Also, the kiosk records the Plaintiff submitted in response to Defendant's summary judgment motion also tend to show that Defendant Stroupe and the SECMG staff performed their duties diligently and were responsive to the Plaintiff's concerns and requests for care. [See Doc. 35-1 at 7, 8, 13, 14, 17-20, 23-28, 32, 33, 37, 39]. The medical records reflect that the healthcare providers who treated the Plaintiff at the Jail, including Defendant Stroupe, consistently sought to provide the Plaintiff with the treatment prescribed by his outside healthcare providers. They were also responsive to the Plaintiff's needs and requests for additional care. There is, therefore, no genuine issue of material fact as to whether Defendant Stroupe was deliberately indifferent to Plaintiff's serious medical needs.

The Plaintiff has also presented no evidence in support of his allegation that Defendant Stroupe ignored the Plaintiff's oncologist's orders for treatment or tests. The Plaintiff specifically alleges that Defendant Stroupe failed to do certain tests ordered by Dr. Hanna. While there is some evidence in the record that Dr. Hanna may have ordered a PET scan and referral to an ENT physician while the Plaintiff was incarcerated in Tennessee, there is no evidence that Defendant Stroupe, or anyone from SECMG for that matter, was ever made aware of that order or failed to follow it. Furthermore, there is no other forecast of evidence before the Court even suggesting a failure by Defendant Stroupe or any other SECMG staff to follow the orders of the Plaintiff's oncologists or other healthcare providers.

Next, the Plaintiff has not forecasted any evidence to show that he actually suffered an injury caused by any alleged conduct by Stroupe. It is well established that a delay in medical care without resulting injury does not violate the Eighth Amendment. See Strickler v. Waters, 989 F.2d 1375, 1380-81 (4th Cir. 1993). The evidence shows that the Plaintiff completed chemotherapy

and radiation therapy for stage IV tonsillar cancer only two weeks before the beginning of his detention at the Jail. The evidence also shows that the Plaintiff arrived at the Jail in a compromised condition and with radiation burns and throat pain. The Plaintiff seeks to attribute the continuation of those conditions to Defendant Stroupe's care but fails to actually connect any action or inaction by Stroupe to these conditions.

In short, the Plaintiff has not forecast evidence to show that anything Defendant Stroupe did or did not do caused injury to the Plaintiff.

Ultimately, the Plaintiff's claims cannot meet the high burden necessary to establish deliberate indifference to Plaintiff's serious medical needs or that Defendant Stroupe's care (or lack of care) was the reason for the Plaintiff's alleged injuries. The Court, therefore, finds that Plaintiff has failed to raise a genuine factual dispute sufficient to overcome Defendant's summary judgment motion.

## IV. PLAINTIFF'S MOTION TO ADD P.A. DODD AS A DEFENDANT

In his summary judgment motion, the Plaintiff moved to amend his complaint to add P.A. Dodd as a Defendant. [Doc. 36 at 2]. In addition to being prejudicially late and lacking in proper form, the Plaintiff's motion is also futile. Leave to amend should be "freely give[n] . . . when justice so requires." FED. R. CIV. P. 15. However, "a district court has discretion to deny a motion to amend a complaint, so long as it does not outright refuse 'to grant the leave without any justifying reason.'" Equal Rights Ctr. v. Niles Bolton Assocs., 602 F.3d 597, 603 (4th Cir. 2010) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)). A district court may deny a motion to amend when the amendment would be prejudicial to the opposing party, the moving party has acted in bad faith, or the amendment would be futile. Id.

Here, the Court's grant of summary judgment for Defendant Stroupe would apply just as

equally to the care provided by P.A. Dodd. In reviewing the Plaintiff's medical records relative to the instant summary judgment motion, it is also evident that P.A. Dodd did not act with deliberate indifference to Plaintiff's serious medical condition. As such, even if the Court were to allow Plaintiff's motion to add P.A. Dodd as a Defendant, summary judgment would be granted in his favor in any event. As such, the Plaintiff's motion to amend is denied.

## V. CONCLUSION

In sum, for the reasons stated herein, the Court grants Defendant Stroupe's summary judgment motion, denies the Plaintiff's summary judgment motion, and denies Plaintiff's motion to amend his complaint to add Colby Dodd, PA-C, as a Defendant.

**IT IS, THEREFORE, ORDERED** that:

1. Defendant Stroupe's Motion for Summary Judgment [Doc. 25] is **GRANTED**, and this action is dismissed with prejudice.
2. Plaintiff's Motion for Summary Judgment [Doc. 36] is **DENIED**.
3. Plaintiff's Motion to Add Colby Dodd as a Defendant in this matter [Doc. 36] is **DENIED**.
4. The Clerk is respectfully instructed to terminate this action.

Signed: August 14, 2019

_____
Frank D. Whitney
Chief United States District Judge